## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Valerie J. Pelton**
**1600 S. Eads Str. #803N**
**Arlington, VA 22202,**

   *Plaintiff,*

v.

**MEGAN BRENNAN,**
**Postmaster General**
**U.S. Postal Service**
**475 L'Enfant Plaza SW,**
**Washington, D.C., 20260,**

  **Serve:**

  **William H. Barr**
  **Attorney General**
  **U.S. Department of Justice**
  **950 Pennsylvania Ave. NW**
  **Washington, DC 20530**

  **Jessie K. Liu**
  **U.S. Attorney, District of Columbia**
  **United States Attorney's Office**
  **555 4th Street, NW**
  **Washington, DC 20530**

  *Defendant.*

**Civil Action No.:**
**JURY TRIAL DEMANDED**

## COMPLAINT FOR EQUITABLE AND
## MONETARY RELIEF AND DEMAND FOR JURY TRIAL

  Plaintiff Valerie J. Pelton brings this action against Defendant Megan Brennan under

Section 504 of the Rehabilitation Act, 29 U.S.C. § 791.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because it asserts claims that arise under the laws of the United States, specifically Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791.

2.      This Court has jurisdiction over this suit pursuant to 39 U.S.C. § 409(a) because it is brought against United States Postal Service (USPS).

3.      Venue in this district is proper because USPS is headquartered in Washington, D.C.

## PARTIES

4.      Pelton is a resident of Arlington, Virginia, and has been continuously employed by USPS since November 30, 2013.

5.      Megan Brennan is Postmaster General for USPS, which is an independent agency of the federal government headquartered in the District of Columbia.

## ADMINISTRATIVE PREREQUISITES

6.      Pelton has complied with all administrative prerequisites necessary to bring this action.

7.      Pelton timely filed a charge of disability discrimination and retaliation against USPS on March 23, 2018.  The USPS EEO office issued an acknowledgement on April 19, 2018.

8.      Pelton has received the agency's Report of Investigation and more than three hundred and sixty days (360 days) have elapsed since Pelton filed her formal complaint.

## FACTUAL ALLEGATIONS

9.      Pelton is a 54-year old military veteran who suffers from several disabilities that substantially affect her daily life activities.

10.      Her disabilities at the time she was hired by USPS included a spinal cord injury, cervical fusions, bilateral thoracic outlet syndrome, nerve damage, depression and Factor V Leiden (a genetic clotting disorder). She has a 90% disability rating from the United States Department of Veterans Affairs (VA). The VA recognized her as having these disabilities and gave her Schedule A hiring status.

11.      USPS competitively hired Pelton as an attorney in November 30, 2013. She was not hired under Schedule A or other non-competitive hiring authority.

12.      During Pelton's tenure as a USPS employee, injuries and/or disabilities which occurred, were diagnosed and were and/or are being treated on an on-going basis include peripheral nerve entrapment syndrome, carpal tunnel syndrome, tendon and ligament tears in her arms and elbows, tremors in her right hand, and anxiety, depression, chronic insomnia and weight gain.

13.      Daniel Foucheaux, Pelton's direct supervisor until March 2017, consistently issued her satisfactory or better performance evaluations in 2014, 2015, and 2016.

14.      Foucheaux retired mid-fiscal reporting year in March 2017 and Richard Cooper temporarily became her reviewing supervisor until Nabeel Cheema was hired and reported for duty in mid-September 2017.

15.      After Foucheaux retired in March 2017, Pelton had three temporary direct supervisors from March 2017 through mid-September 2017:  John Rosato, Alexandra Reams and

David Ruben. Nabeel Cheema became Pelton's permanent direct supervisor in mid-September 2017.

16.     Pelton requested reasonable accommodation for her disabilities in December 2013 shortly after she was hired by USPS.  These requests were denied.  As a result, over time, she developed tendon and ligament tears in her elbows and forearms due to excessive work-related typing.

17.     Pelton experienced ongoing medical issues related to her elbows and forearms since approximately early 2016. Beginning in April 2016, Pelton sought treatment for her elbows and forearms. As her medical conditions persisted and worsened throughout 2016, she experienced medical problems with her hands and sought treatment them as well as for her elbows and forearms.

18.     Due to improper ergonomics and excessive typing, Pelton experienced increasing burning, tingling and numbness in her elbows, forearms and hands. Her elbows started locking and she had difficulty bending and unbending them.  In March 2016, she started wearing old 15-20 Hg compression sleeves from when she had upper extremity DVTs, pulmonary embolisms and phlebitis in 2008-2010 to alleviate the swelling and provide some support to her arms. She also started propping her arms up on pillows and putting padding on her office chair arms in an effort to alleviate the pain, swelling, burning, tingling and numbness.

19.     During this same period, Pelton experienced painful vascular issues in her feet and legs related to complications from Factor V Leiden. At three-month intervals throughout summer and fall 2016, she underwent multiple vascular procedures.  Each vascular procedure put her at risk of developing blood clots for six to eight months.  Her last vascular procedure occurred in November 2016.  During the months prior to and after the vascular procedures, she

4

experienced severe problems with her elbow and forearm tendons such that she was largely unable to bend her arms.

20.     In October of 2016, Pelton requested Family and Medical Leave Act (FMLA) leave because of emergency gallbladder surgery and subsequent complications for which she was hospitalized for seven (7) days and required follow up medical evaluations and in-hospital procedures. FMLA leave was approved promptly.  Pelton's health deteriorated due to complications from the surgery and post-operative procedures.  While in the hospital, she developed two staph infections; site phlebitis and a blood clot in her left arm; and a hernia at the main incision site.  After she was discharged, her health deteriorated further.  She had a number of problems relating to the surgery and went through various rounds of appointments with surgeons, gastroenterologists and radiology for post-operative follow up, medical and surgical evaluation, and underwent in-hospital procedures. During the months prior to and after gallbladder surgery, she experienced severe problems with her elbow and forearm tendons such that she was largely unable to bend her arms.

21.     Shortly after commencing prolotherapy and platelet-enriched plasma (PRP) treatment in February 2017, Pelton submitted a reasonable accommodation request on or about March 28, 2017.

22.     In its March 31, 2017 letter, USPS Human Resources Shared Service Center (HRSSC) required Pelton to submit medical information and medical restrictions on USPS reasonable accommodation forms within 14 calendar days from the date she received the letter. Pelton submitted the requested medical information and medical restrictions from her medical providers to HRSSC within the required period.

23.     Pelton initially submitted her FMLA request on or about March 28, 2017.  On

May 2, 2017, the HRSSC rejected the FMLA paperwork completed by each of her doctor and

her physical therapist, and demanded additional information be furnished by these medical

providers and submitted by Pelton by May 12, 2017.  Pelton submitted updated FMLA

paperwork to HRSSC completed by both medical providers within the required period.

24.     From the date of when Pelton requested FMLA and reasonable accommodation, it

took approximately over two months for USPS to review and approve the FMLA paperwork and

approximately three months for USPS to review and approve Pelton's reasonable

accommodation request.

25.     In order to manage her disabilities and treat elbow and forearm ligament and

tendon injuries and peripheral nerve entrapment syndrome, Pelton underwent PRP treatment

and/or prolotherapy treatment to her forearms and elbows approximately every six to eight

weeks beginning in February 2017 to present. The treatment requires a complete cessation from

typing for five days beginning the day of and the four days following treatment as typing during

this period can cause additional injuries.

26.     On March 28, 2017, Pelton's physician submitted a medical restriction letter

limiting her time typing to three hours total per day, no more than twenty minutes in a one-hour

period.

27.     On or about March 29, 2017, Cooper tasked Pelton with assisting Global Business

(the "International Group"), as the group was short-staffed.  Although Cooper initially told her

that she would not need to type more than three hours a day, as Pelton replaced a departing full-

time contract attorney who performed that work for the International Group, the international

work assignment typing soon exceeded medical limits on typing. The work involved typing

notices, drafting materials for filing packages, filing reports online and responding to numerous emails in a high-volume practice. As Pelton was also performing her regular section assignments in addition to assisting the International Group, even on days when Pelton had treatment, she was required to type up to eight or nine hours in order to complete her assignments on time.

28.     This excessive typing workload led to swelling and extreme pain in Pelton's elbows, forearms, and hands, inability to sleep due to the pain, and a pronounced tremor in Pelton's right hand as well as burning, tingling and numbness from her elbows, down her forearm and in her hands and fingers. Her elbows, forearms and hands became very swollen and were so painful that she needed to apply ice to her elbows for three to four hours nightly; to prop her arms up on feather pillows at night; and to wear compression sleeves, compression gloves, and tendon stabilization bands.  Pelton also wore elbow pads to cushion her elbows and taped towels around the arms of her non-ergonomic office chair until it was replaced with an ergonomic chair in July 2017.

29.     The physical impact and repetitive strain of excessive typing caused Pelton extreme pain, resulted in repeated tendon and ligament tears, worsened her existing medical disabilities, led to permanent damage to her arms, and created new additional medical disabilities.  It also caused her to endure continuing painful medical treatments and incur continuing costs of expensive medical treatments and diagnostic tests which were either not covered or only partially covered by medical insurance.

30.     Concerned with potentially losing the use of her hands, and the large out-of-pocket costs she was incurring for medical treatment to maintain the use of her arms, Pelton spoke to the Acting Chief Counsels, her colleagues in her duty section and her colleagues in the International Group multiple times during this period.  After Pelton emailed Cooper on May 4,

2017, Cooper ordered Pelton to comply with her restrictions and ordered her to stop assisting the International Group.

31.     Due to the agency's failure to accommodate Pelton per her physician's medical restrictions and the resulting adverse impact on her medical condition, Pelton began requesting medical leave for the five days post-treatment when she is unable to type.

32.     On May 11, 2017, Pelton's physician issued a second medical restriction letter containing the same restrictions as his March 28, 2017 letter, and the restriction that she cease typing for up to five days post treatment, depending on the treatment. As with the first medical restriction, Pelton also provided this second medical restriction to Cooper.

33.     Despite being furnished two medical instruction letters, Cooper and USPS Law Department management ignored both medical restrictions from Pelton's doctor regarding medically necessary work restrictions.

34.     On May 31, 2017, after a lengthy application review process, USPS granted Pelton's FMLA leave request.

35.     Cooper excluded Pelton from important projects, even though managers of three separate groups outside of the Law Department sought her out for detail assignments because of her superior work product, knowledge, skills and experience. Contrary to USPS Human Resources (HR) policy contained in the Employee & Labor Relations Manual (ELM), Handbook EL-312 Employment Placement, Handbook EL-380 Postal Career Executive Service (PCES), Cooper denied each of these detail requests.

36.     In February 2017, Jeff Williamson, Chief Human Resources Officer and Executive Vice President, told Pelton that she needed to find another position as General

Counsel Tom Marshall and Deputy General Counsel Kevin Calamoneri thought that she was "not a good fit."

37.     Although Pelton was ordered to find another position in February 2017, Cooper subsequently denied three separate requests from three separate HQ USPS managers outside of the USPS Law Department who requested Pelton go on detail assignments to their respective departments outside of the USPS Law Department.

38.     Throughout the remainder of 2017, Cooper and Cheema implied that she was not wanted at USPS by restricting her participation in core section projects, excluding her from section meetings, and restricting contact with HQ USPS internal/departmental clients.

39.     Starting in May 2017, USPS began to reassign Pelton's work to her section colleagues.

40.     Within approximately two weeks of becoming Pelton's new direct supervisor in September 2017, Cheema reassigned all Pelton's substantive work to her section colleagues except for one periodicals litigation matter.

41.     On or about November 6, 2017, Cooper issued Pelton her 2017 end-of-year (EOY) performance evaluation, which included an inaccurate and negative assessment of her performance. Notably, Cooper referred to the volume of work Pelton was completing compared to others in her group who do not have the same medical restrictions and disabilities.  Cooper and Cheema did not assign substantive "core" section work to Pelton.

42.     On or about November 8, 2017, USPS HRSSC issued a letter instructing Pelton to denying scheduled FMLA leave corresponding to scheduled treatment beginning November 16, 2017 and requiring she obtain additional medical documentation to recertify her scheduled FMLA leave.  Pelton received notice of the notice of revocation and recertification requirement

via US Mail on November 13, 2017. This came as a surprise to Pelton because she had FMLA approval through the end of 2017. The date of the recertification notice was contemporaneous with the date of the 2017 EOY evaluation. The recertification specifically stated that the FMLA leave for November 16, 17 and 20, 2017, associated with her next round of medical treatment for her medical condition, and for leave December 14, 15 and 16, 2017, associated with her subsequent round of medical treatment for her medical condition, were both denied. Cheema was responsible for the recertification requirement from and the denial by USPS HRSSC of scheduled FMLA leave for Pelton's scheduled on-going medical treatment.

43.     At or about the same time, Cheema also reduced Pelton's telework schedule.

44.     Concerned about the inexplicable revocation of her FMLA status and denial of FMLA leave for medically necessary treatment three days prior to her next medical treatment appointment, Pelton emailed the Deputy Postmaster General Ronald Stroman on November 14, 2017, explaining the differential and discriminatory treatment she had experienced throughout the year. She requested to meet with Stroman to figure out a solution.  Stroman refused to meet with Pelton.

45.     On the afternoon of November 15, 2017, Cheema sent Pelton an email ordering her to submit a new leave form.  To avoid disrupting treatment, Pelton went to her scheduled November 16, 2017 morning appointment.  To avoid being considered absent without leave, she hand-delivered the requested new leave form for non-FMLA leave to Cheema after completing treatment on November 16, 2017.

46.     On December 20, 2017, Cooper and Cheema came to Pelton's office unannounced to issue her the 2017 end-of-year rating corresponding with the 2017 review she received on November 6, 2017. Cooper and Cheema issued Pelton an overall rating of "two" on

a scale of one to ten. This rating was the lowest that Pelton had received in over four years working at USPS.

47.    As a result of the "two" rating, Pelton did not receive an annual salary increase, and it affected her internal development and eligibility for detail assignments.  The "two" rating and the negative evaluation language each inaccurately indicated her work did not either meet or exceed standards.

48.    Pelton contacted the EEO hotline on December 18, 2017 and December 21, 2017 to initiate the EEO process based on these actions.

49.    On March 23, 2018, Pelton filed her formal EEO complaint outlining the above discrimination and retaliation.

50.    On May 3, 2018, Pelton received her 2018 mid-year performance evaluation. This performance review was conducted by the same supervisors, Cheema and Cooper. Mid-year performance reviews do not have ratings as end-of-year performance evaluations do, but the feedback in them informs ratings given for the entire year.

51.    Pelton's 2018 mid-year performance evaluation was inaccurate and contained negative and unprofessional comments.  The review contains several inaccurate claims: (1) that Pelton's work is not concise and frequently irrelevant, to the point that it is not worth editing or using; (2) that Pelton inserts her own interests in her work; (3) that Pelton "dominates" meetings, and (4) that Pelton's clients have complained about her. These statements have been used as pretext for USPS to justify excluding Pelton from working on important projects bar her from future work meetings.

52.    In response to this evaluation, Pelton amended her EEO Complaint on May 18, 2018.

53.     On October 31, 2018, Cheema and Cooper issued Pelton's 2018 end-of-year performance evaluation.

54.     On December 4, 2018, Cheema issued Pelton a 2018 end-of-year rating of "one," the lowest possible score on the evaluation.  The narrative supplied by Cheema contained inaccurate, negative and unprofessional comments, including false allegations that Pelton's "work continued to require significant revision" because of "substantial amounts of non-relevant information, both in her written work and oral advice," that Pelton's legal advice was non-relevant, and that she misinterpreted clients. Cheema also stated that the work environment is "fast-moving," implying that Pelton is slow and unable to perform her duties because of her disabilities and her medically necessary typing restrictions.

55.     In response to the 2018 evaluation and rating, Pelton again amended her EEO Complaint on December 14, 2018.

56.     On May 2, 2019, USPS issued Pelton her 2019 mid-year performance evaluation, approximately one month after Pelton filed a request for an EEOC hearing. Again, USPS falsely claimed that Pelton's performance and communication/writing skills were substandard.

## COUNT I: Disability Discrimination
## (Section 504 of the Rehabilitation Act)

57.     Plaintiff adopts and incorporates by reference the averments of the proceeding paragraphs as if fully set forth herein.

58.     Defendant has discriminated against Plaintiff on the basis of her disability. Section 504 of the Rehabilitation Act, 29 U.S.C. § 791, makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of disability or perceived disability.

59.      Pelton suffers from disabilities as defined by the Rehabilitation Act, including her elbow, forearm and hand injuries, which require reasonable accommodations and impact one or more of her major life activities, including her ability to sit for long periods and her ability to work, including her ability to type for long periods of time and perform high-volume typing.

60.      Since joining USPS in 2013, despite being both a disabled veteran with a 90 percent disability rating from the VA and an individual with Schedule A disabilities, Pelton demonstrated her qualifications for her job and her good performance as reflected in the reviews from Foucheaux while he was her supervisor during the over three years she worked at USPS before she requested medical leave authorization relating to treatment of, and reasonable accommodation for, the injuries and additional new disabilities incurred while working at USPS as a result of USPS Law Department's failure to provide ergonomic equipment and reasonable accommodation when she joined USPS in 2013

61.      After Pelton requested FMLA medical leave authorization relating to treatment of, and reasonable accommodation for, her injuries and additional new disabilities incurred while working at USPS as a result of USPS Law Department's failure to provide ergonomic equipment and reasonable accommodation when she joined USPS in 2013, USPS failed to provide ergonomic equipment and reasonable accommodation after Cooper became her supervisor in March 2017; USPS failed to provide ergonomic equipment and reasonable accommodation promptly after subjecting Pelton's reasonable requests for medical leave for treatment of, and reasonable accommodation for, her medical condition to lengthy and prolonged review; and USPS failed to provide reasonable accommodation after Cheema became her current supervisor in September 2017.

62.      Defendant subjected Plaintiff to adverse actions when:

     a.     It refused to accommodate Pelton's disabilities and subjected her to physically damaging high-volume typing after she requested medical leave and reasonable accommodations from March to May 2017.

     b.     It refused to assign work to Pelton and restricted her access to duty section and client work meetings from May 2017 through the present.

     c.     It reassigned all her then-existing work in October 2017.

     d.     It allowed her to attend two weekly HQ USPS internal client work meetings beginning in early 2018, but ordered her to remain silent and not speak unless spoken to.

     e.     It temporarily revoked Pelton's FMLA leave on or about November 13, 2017 days before she was scheduled to undergo medical treatment.

     f.     It issued Pelton inaccurate and highly negative performance evaluations and ratings on the following dates:

         i.     November 6, 2017 end-of-year performance evaluation;

         ii.     December 20, 2017 end-of year rating;

         iii.     May 3, 2018 mid-year performance evaluation;

         iv.     October 31, 2018 end-of-year performance evaluation;

         v.     December 4, 2018 end-of-year rating;

         vi.     May 2, 2019 mid-year performance evaluation.

63.     Each of the above actions represent a significant and objective change to employment status as well as significant changes in Pelton's work responsibilities: the overwork and subsequent underwork are significant departures from the responsibilities and terms Pelton agreed to when she accepted USPS's employment offer in November 2013. In addition, the

negative and inaccurate performance evaluations from Cooper and Cheema materially and adversely affected Pelton's career advancement. The adverse employment actions Pelton suffered are therefore material.

64.     Defendant's material adverse employment actions are discriminatory because:

      a.     USPS refused to conform to Pelton's medical restriction letters, each of which letters outlined reasonable accommodations based on Pelton's arm-related disabilities.

      b.     USPS inexplicably revoked Pelton's FMLA leave status temporarily immediately prior to Pelton undergoing scheduled medical treatment directly related to her medical disabilities

      c.     Cooper and Cheema's inaccurate and damaging evaluations and ratings directly referenced Pelton's ability to perform "fast-paced" work and her ability to perform the same volume of work as colleagues who are not similarly disabled workers, both statements are references to Pelton's disabilities and Pelton's medically necessary typing restrictions.

65.     As a result of Defendant's violations of the Rehabilitation Act, Plaintiff has suffered and is continuing to suffer injuries, including, but not limited to, damage to her career, damage to her professional and personal reputation, humiliation, emotional distress, loss of enjoyment of life, recurrent and on-going physical injuries, on-going medical treatment, on-going medical expenses. and pain and suffering.

### COUNT II: Retaliation
### (Section 504 of Rehabilitation Act)

66.     Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

67.     Defendant retaliated against Plaintiff on the basis of her opposition to disability discrimination and requests for reasonable accommodations for her disability, and other protected activity.

68.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 791(g), makes it unlawful for an employee to be subjected to harassment or any other adverse employment action on the basis of her opposition to disability discrimination or for the request for reasonable accommodations.

69.     Plaintiff engaged in protected activity when she:

a.      requested medical leave in October of 2016;

b.      requested reasonable accommodations in the form of two medical restriction letters in on March 28, 2017 and May 11, 2017;

c.      raised concerns about her disparate treatment to Cooper on May 3, 2017 and the Deputy Postmaster General on November 14, 2017;

d.      contacted the EEO on December 18, 2017 and December 21, 2017;

e.      filed a timely a formal EEO complaint related to disability discrimination and retaliation on March 23, 2018;

f.      filed multiple amendments to the EEO complaint on May 18, 2018 and December 14, 2018 and filed a Request for a Hearing on March 25, 2019.

70.     Defendant subjected Plaintiff to adverse actions when:

a.      It refused to accommodate Pelton, subjecting her to physically damaging overwork from March to May 2017.

b.      It subsequently refused to assign work to Pelton, restricted her access to work, denied three separate detail assignment requests from three separate managers outside of the USPS Law Department, and barred her from section and HQ USPS internal

16

client work meetings from May 2017 through the present.  Cheema allowed her to attend

two weekly HQ USPS internal client work meetings beginning in early 2018, but ordered

her to remain silent and not speak unless spoken to.

      c.      It temporarily revoked Pelton's FMLA status on or about November 8,

2017 and denied scheduled FMLA medical leave for scheduled medical treatment.

Pelton received notice of the revocation and denial of FMLA leave via US Mail on

November 13, 2017, days before she was scheduled to undergo scheduled medical

treatment.

      d.      It issued Pelton inaccurate and highly negative performance evaluations

and ratings on the following dates:

          i.      November 6, 2017 end-of-year performance evaluation;

          ii.      December 20, 2017 end-of year rating;

          iii.      May 3, 2018 mid-year performance evaluation;

          iv.      October 31, 2018 end-of-year performance evaluation;

          v.      December 4, 2018 end-of-year rating;

          vi.      May 2, 2019 mid-year performance evaluation.

71.      Each of the above actions represent a significant and objective change to

employment status as well as significant changes in Plaintiff's work responsibilities: the

overwork and subsequent underwork are significant departures from the responsibilities and

terms Plaintiff agreed to when she accepted USPS's offer of employment. In addition, the

negative performance evaluations materially and adversely affected Pelton's career

advancement. The adverse employment actions Plaintiff suffered are therefore material.

72.     USPS is aware of Plaintiff's greater than 30 percent VA disability rating and Schedule A status as she provided the documentation to USPS as part of her employment application.

73.     USPS is aware of Plaintiff's greater than 30 percent VA disability rating and Schedule A status as she again provided the documentation to USPS in 2017 during USPS's lengthy review of her reasonable requests for reasonable accommodation and FMLA medical leave authorization.

74.     USPS is aware of Plaintiff's medical restriction letters, use of medical leave, and her EEO activity as all of these activities are reported to one's supervisors.

75.     The adverse actions all occurred in close temporal proximity to Plaintiff's protected conduct. Pelton was subjected to overwork from March to May 2017, immediately after her medical restriction letters were submitted in March and May 2017. Pelton had her work taken away from her immediately after she informed USPS that she was having to work beyond her medically necessary typing restrictions and sent in her second medical restriction letter, all in May 2017. Pelton received her "two" rating in December 2017, shortly after she attempted to contact the Deputy Postmaster General and shortly after she opposed USPS's efforts to revoke her medical leave.

76.     As a result of Defendant's repeated and on-going violations of the Rehabilitation Act, Plaintiff has suffered and is continuing to suffer injuries, including, but not limited to, damage to her career, damage to her professional and personal reputation, humiliation and emotional distress, loss of enjoyment of life, recurrent and on-going physical injuries, on-going medical treatment, on-going medical expenses, and pain and suffering.

## COUNT III: Hostile Work Environment
### (Section 501 of the Rehabilitation Act)

77.     Plaintiff adopts and incorporates by reference the averments of the proceeding paragraphs as if fully set forth herein.

78.     Defendant discriminated against Plaintiff on the basis of her disability.

79.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 791, makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of disability or perceived disability.

80.     Because the workplace environment is a term, condition, or privilege of employment, the Rehabilitation Act, like the Americans with Disabilities Act, creates a cause of action for employees forced to work in a hostile work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

81.     To make out a *prima facie* case for hostile work environment a plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of her disability (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and (4) was imputable to her employer.  *See Harris*, 510 U.S. at 20.

82.     Pelton suffers from one or more disabilities as defined by the Rehabilitation Act, including, but not limited to the injuries to her elbows, forearms and hands, that require reasonable accommodations and impact one or more of her major life activities, including her ability to sit and work for long periods of time.

83.     Pelton's experience as an attorney at USPS for more than five years and her documented good performance at USPS from 2013 to 2016 -- despite her service-connected disabilities and Schedule A disabilities -- demonstrate her qualifications for her job.

84.     Cooper became her supervisor in March 2017.  After she requested medical leave and reasonable accommodation status, Cooper issued inaccurate and damaging performance evaluations in 2017 that questioned Pelton's qualifications for her job that alluded to her disabilities and medical restrictions.

85.     After Cheema, who reports directly to Cooper, became her supervisor in September 2017, Cheema issued inaccurate and damaging performance evaluations in 2018 and 2019 that questioned her qualifications for her job and made statements that alluded to her disabilities and medical restrictions.

86.     Defendant subjected Plaintiff to adverse actions when:

a.     It refused to accommodate Pelton, subjecting her to damaging overwork in from March to May 2017.

b.     It refused to assign work to Pelton and restricted her access to work meetings from May 2017 through the present.

c.     It allowed her attend two weekly HQ USPS internal client work meetings beginning in early 2018, but ordered her to remain silent and not speak unless spoken to.

d.     It temporarily revoked Pelton's FMLA leave and denied FMLA leave for scheduled treatments in both November 2017 and December 2017 on or about November 8, 2017.  Pelton received notice of the revocation and denial via US Mail on November 13, 2017.

e.     It issued Pelton inaccurate performance evaluations and ratings on the following dates:

i.      November 6, 2017 end-of-year performance evaluation;

ii.     December 20. 2017 end-of year rating;

     iii.       May 3, 2018 mid-year performance evaluation;

     iv.       October 31, 2018 end-of-year performance evaluation;

     v.       December 4, 2018 end-of-year rating;

     vi.       May 2, 2019 mid-year performance evaluation.

87.     In addition to the above adverse actions, Defendant subjected Plaintiff to a hostile work environment from Spring 2017 to the present, including, but not limited to the following:

     a.       USPS Human Resources Shared Service Center (HRSSC) reviewed Pelton's FMLA paperwork for over two months and originally rejected it;

     b.       USPS HRSSC took approximately three months to review and approve Pelton's March 2017 reasonable accommodation request.

     c.       In February 2017, Jeff Williamson, Chief Human Resources Officer and Executive Vice President, told Pelton that she needed to find another position as Tom Marshall and Kevin Calamoneri thought that she was "not a good fit";

     d.       At the same time that USPS revoked Pelton's FMLA leave, denied FMLA leave for scheduled medical treatments in both November 2017 and December 2017, and required her to obtain additional medical documentation for recertification, Cheema also reduced Pelton's telework schedule, and;

     e.       During the same time period in 2017, Managing Counsel Rick Cooper denied three separate requests from three separate HQ USPS managers outside of the Law Department for Pelton to go on Detail assignments outside of the USPS Law Department.  Cooper and/or Cheema also failed to respond to Pelton's requests for training and to attend legal-related industry events.

88.     As a result of Defendant's violations of the Rehabilitation Act, Plaintiff has suffered and is continuing to suffer injuries, including, but not limited to, damage to her career, damage to her professional and personal reputation, humiliation, emotional distress, loss of enjoyment of life, recurrent and on-going physical injuries, on-going medical treatment, on-going medical expenses, and pain and suffering.

## PRAYER FOR RELIEF

Based on the foregoing, Pelton respectfully requests that she be awarded the following relief from Defendant:

a.     Economic damages for lost compensation and damages to Pelton's career;

b.     Compensatory damages, including but not limited to pain and suffering, medical expenses, emotional distress and reputational damage;

c.     Reasonable costs and experts' and attorneys' fees;

d.     An injunctive order requiring the Agency to take specific corrective action for the discrimination and retaliation of Pelton in the past and continuing to the present, and that it take appropriate steps to protect Pelton from further acts of discrimination and retaliation in the future.

e.     Any other such relief that the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Pelton requests a trial by jury for any and all issues proper to be so tried.

Respectfully Submitted,

R. Scott Oswald, DC Bar 418859
Kellee Boulais Kruse, DC Bar 994450
The Employment Law Group, P.C.
888 17th Street, N.W., 9th floor
Washington, D.C. 20006
(202) 261-2838
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
kkruse@employmentlawgroup.com
*Counsel for Plaintiff*