## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VALERIE J. PELTON,

        *Plaintiff*,

    v.

LOUIS DEJOY,

        *Defendant*.

Civil Action No. 19-1766 (LLA)

## <u>MEMORANDUM OPINION AND ORDER</u>

Valerie J. Pelton brings this action against Louis DeJoy, the Postmaster General of the United States and Chief Executive Officer of the U.S. Postal Service ("USPS"), alleging disability discrimination and retaliation, failure to accommodate, and hostile work environment in violation of the Rehabilitation Act of 1973. Pending before the court are the USPS's motion for summary judgment, ECF No. 30, and Ms. Pelton's cross-motion for partial summary judgment, ECF No. 34. For the reasons explained below, the court **GRANTS** in part and **DENIES** in part the USPS's motion for summary judgment and **DENIES** Ms. Pelton's motion for partial summary judgment.

## I.    Factual Background

Valerie Pelton has worked for the USPS as an attorney since November 2013. ECF No. 16 ¶¶ 4, 13. She is a military veteran with multiple disabilities. *Id.* ¶ 11. At the time she was hired by the USPS, her disabilities included a spinal cord injury, cervical fusions, bilateral thoracic outlet syndrome, nerve damage, depression, and a genetic clotting disorder. *Id.* ¶ 12. During her tenure with the USPS, she has been diagnosed with and/or treated for peripheral nerve entrapment syndrome, carpal tunnel syndrome, tendon and ligament tears in her arms and elbows, tremors in her right hand, anxiety, depression, chronic insomnia, and weight gain. *Id.* ¶ 14. Both parties

agree that Ms. Pelton is a person with a disability within the meaning of the Rehabilitation Act. *See* ECF No. 35 at 8.

From November 2013 to March 2017, Daniel Foucheaux was Ms. Pelton's direct supervisor and Richard Cooper was her second-line supervisor. ECF No. 16 ¶¶ 15-16; ECF No. 35-1 ¶ 9. After Mr. Foucheaux retired, several individuals, including Mr. Cooper, acted as Ms. Pelton's direct supervisor. ECF No. 35-1 ¶ 10. Nabeel Cheema became Ms. Pelton's direct supervisor in September 2017. *Id.* ¶¶ 6-7.

Ms. Pelton alleges that, during her first week with the USPS, she requested an ergonomic chair, desk, keyboard, and mouse from an employee conducting her orientation. ECF No. 35 at 10-11. The employee told Ms. Pelton that there was no room in the budget for such an accommodation, and instead "showed [her] to a room full of broken office equipment from which [Ms.] Pelton was expected to select." *Id.* at 11. The USPS disputes whether Ms. Pelton in fact made this request. ECF No. 45 at 4. The parties agree that Ms. Pelton asked Mr. Foucheaux for— and received—an ergonomic keyboard and mouse as a reasonable accommodation in 2014. *Id.* at 4-5. Ms. Pelton did not receive an ergonomic chair and desk until June 2017 and August 2017, respectively. ECF No. 35-1 ¶¶ 48-49. Because of this failure to accommodate her disabilities, Ms. Pelton alleges that over time, she developed tendon and ligament tears in her elbows and forearms due to "improper ergonomics and excessive typing." ECF No. 16 ¶¶ 18, 20. By 2016, she was experiencing "increasing burning, tingling and numbness in her elbows, forearms and hands," had difficulty bending and unbending her elbows, and began wearing compression sleeves and propping up her arms on pillows to try to alleviate the pain. *Id.* ¶ 20.

As noted, after Mr. Foucheaux retired in 2017, several individuals, including Mr. Cooper, acted as Ms. Pelton's direct supervisor. ECF No. 35-1 ¶ 10. On March 21, 2017, Mr. Cooper

assigned Ms. Pelton to work with the International Law Group section.  *Id.* ¶¶ 23-24.  Per Ms. Pelton, this required additional typing-intensive work in addition to maintaining her regular duties for her own section.  *Id.*

On March 28, 2017, Ms. Pelton received instructions from her doctor stating that she "was to type only for twenty minutes per one-hour period, not to exceed three hours per day."  ECF No. 35 at 11.  On March 29, 2017, Ms. Pelton informed her supervisors that she was undergoing treatment for ongoing medical issues, including for neuromuscular issues impacting her use of her arms and hands.  ECF No. 30-22 at 22 (Def. Ex. S).  She explained that her ability to type was restricted during the duration of the treatment, and that her email responses and turn-around time for typed work product might therefore be delayed.  *Id.*  Mr. Cooper promptly referred Ms. Pelton to the USPS's Reasonable Accommodations Committee ("RAC"), and the committee began the interactive process.  ECF No. 35-1 ¶¶ 40-43; ECF No. 30-1 at 9.

Because "[f]ew disabilities are amenable to one-size-fits-all accommodations . . . an employer needs information about the nature of the individual's disability and the desired accommodation" to meet its obligations under the Rehabilitation Act.  *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014).  The employer does so via "an informal, interactive process with the individual with a disability [to] identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  *Id.* at 32 (quoting 29 C.F.R. § 1630.2(o)(3)).  As part of the interactive process, the employer "may require that the individual with a disability provide documentation of the need for accommodation."  *Id.* (quoting *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1309 (D.C. Cir. 2010)).  Here, the RAC and Ms. Pelton engaged in the interactive process from March to May 2017: the RAC reached out to Ms. Pelton several times for additional information, which Ms. Pelton provided; completed an

ergonomic evaluation of her workstation; and ultimately provided its recommendations to Mr. Cooper on May 15, 2017.  ECF No. 35-1 ¶¶ 40-47.

The parties agree that, while the interactive process was underway, Ms. Pelton did not comply with her medical typing restrictions.  *Id.* ¶ 25.  Ms. Pelton argues that she could not comply with these restrictions due to the workload assigned to her, and that she was therefore subjected to "physically damaging overwork."  *Id.*; ECF No. 16 ¶ 75(a).  The parties dispute whether Ms. Pelton notified her supervisors that she could not complete her assigned work without violating her typing restrictions.  ECF No. 35-1 ¶ 26.  On May 5, 2017, Mr. Cooper explicitly told Ms. Pelton not to violate her typing restrictions.  *Id.* ¶ 27.  Ms. Pelton ultimately received an ergonomic chair and voice-dictation software as reasonable accommodations in June 2017, and an ergonomic desk in August 2017.  *Id.* ¶¶ 48-49.

When Mr. Cheema became Ms. Pelton's direct supervisor in September 2017, he reassigned some of her work and reduced her telework schedule from three days per week to two days per week.  *Id.* ¶¶ 7, 28-30.  Mr. Cheema believed that Ms. Pelton's work needed significant improvement.  *Id.* ¶¶ 11-14.  The USPS alleges that Ms. Pelton "struggled to provide concise written and oral counsel to Agency clients," that her "written work often required correction," and that she "did not conduct herself appropriately in meetings with clients, providing non-relevant legal counsel."  *Id.* ¶¶ 11-12, 14.  Ms. Pelton disputes this, arguing that her communications were concise, that she had good relationships with clients, and that Mr. Cheema "had a negative attitude toward [Ms.] Pelton before he began working with her."  *Id.* ¶¶ 11-12.  Ms. Pelton earned ratings of 1 or 2 on her 2017, 2018, and 2019 performance evaluations.  *Id.* ¶¶ 20-22.  (A "1" is the lowest possible score on such an evaluation.  ECF No. 16 ¶ 56.)  Ms. Pelton also alleges that, in February 2017, Chief Human Resources Officer and Executive Vice President Jeff Williamson

told Ms. Pelton that she needed to find another position because General Counsel Tom Marshall and Deputy General Counsel Kevin Calamoneri thought that she was "not a good fit." *Id.* ¶ 38.

Around the time the interactive process was beginning in late March 2017, Ms. Pelton submitted a request to be certified for Family Medical Leave Act ("FMLA") leave related to her disability. ECF No. 35-1 ¶ 51. On May 16, 2017, the USPS approved Ms. Pelton for FMLA leave for unscheduled absences one time every 2-3 months for 3-5 days per episode. *Id.* ¶ 55. On November 8, 2017, Ms. Pelton requested advanced FMLA leave for several days during November and December 2017. *Id.* ¶ 56. The USPS requested that Ms. Pelton recertify her approved FMLA leave. *Id.* ¶ 57.

## II.    Procedural History

Ms. Pelton filed this lawsuit against the USPS on June 18, 2019, asserting claims of (1) failure to accommodate, (2) discrimination on the basis of disability, (3) retaliation on the basis of disability, and (4) hostile work environment, all in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. ECF No. 1; ECF No. 16. Following discovery, the USPS moved for summary judgment under Federal Rule of Civil Procedure 56. ECF No. 30. The USPS argues that it reasonably accommodated Ms. Pelton, that it had legitimate, non-discriminatory, non-retaliatory reasons for each of its actions, and that Ms. Pelton has not sufficiently plead a hostile work environment. *See generally id.* Ms. Pelton cross-moved for partial summary judgment, arguing that she established prima facie cases of discrimination, retaliation, and hostile work environment. *See generally* ECF No. 34.

## III.    Legal Standard

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter

of law." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see* Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255); *see Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295-96 (D.C. Cir. 2015).

In addition, for a factual dispute to be "genuine," the non-moving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*,

477 U.S. at 249-50 (citations omitted).  Moreover, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  In that situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Id.*  The court is only required to consider the materials explicitly cited by the parties but may on its own accord consider "other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court "determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2720 (3d ed. 2016)); *see Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1213 (10th Cir. 2016); *Pac. Indem. Co. v. Deming*, 828 F.3d 19, 23 (1st Cir. 2016).

In an employment discrimination or retaliation action, courts recognize "the difficulty of uncovering clear evidence of discriminatory or retaliatory intent" and therefore "approach summary judgment . . . with 'special caution.'"  *Nagi v. Buttigieg*, No. 16-CV-2152, 2022 WL 2904261, at *4 (D.D.C. July 22, 2022) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)).  At the same time, courts need not accept as true claims made by a non-movant that "rest[] entirely upon a conclusory representation," because "accepting such conclusory allegations as true . . . would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### IV.     Discussion

Ms. Pelton alleges that the USPS violated the Rehabilitation Act by failing to accommodate her disability, discriminating and retaliating against her on the basis of disability, and creating a hostile work environment.  ECF No. 16.  The court takes each allegation in turn.

### A.     Failure to Accommodate

Ms. Pelton alleges that the USPS violated the Rehabilitation Act by failing to provide or unreasonably delaying the provision of five reasonable accommodations: ergonomic office equipment, reduced typing time, voice-dictation software, a modified telework schedule, and an office with a window.    ECF No. 35 at 9.    To survive summary judgment on a failure-to-accommodate claim, the plaintiff must present sufficient evidence to allow a reasonable jury to conclude that: (i) she had a qualifying disability within the meaning of the Rehabilitation Act; "(ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodations; and (iv) her employer denied her request for a reasonable accommodation of [her] disability."  *See Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) (citations omitted).  Here, the first three factors are undisputed.  *See* ECF No. 35 at 8-9.

The parties disagree whether the USPS unreasonably delayed in granting Ms. Pelton ergonomic office equipment, reduced typing time, and voice-dictation software as reasonable accommodations.  *See id.* at 9-10; ECF No. 35 at 9.  The court concludes that the USPS is entitled to summary judgment as to Ms. Pelton's claims that it failed to provide reasonable accommodations of an ergonomic keyboard and mouse, reduced typing time, and voice-dictation software.  However, the court declines to grant summary judgment as to Ms. Pelton's requests for an ergonomic chair and desk.

The parties also disagree about whether Ms. Pelton requested a modified telework schedule and an office with a window as reasonable accommodations for her disability, or merely as matters of personal preference. The court concludes that the USPS is entitled to summary judgment on both.

### 1.      Unreasonable delay

There is no genuine dispute that the USPS ultimately provided Ms. Pelton with ergonomic office equipment, reduced typing time, and voice-dictation software. *See* ECF No. 35-1 ¶¶ 27-28, 37, 48-49; ECF No. 35 at 12. However, Ms. Pelton argues that the agency unreasonably delayed in providing these accommodations. ECF No. 35 at 9-10. "A party that obstructs or delays the interactive process is not acting in good faith," and a plaintiff may establish that her request was "denied" where the defendant "participated in the [interactive] process in bad faith." *Ward*, 762 F.3d at 32 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). Courts have found unreasonable delay where the defendant took more than three years to provide a requested accommodation, *see Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 62 (D.D.C. 2012), and have declined to find that a delay of several months was unreasonable, *see Ward*, 762 F.3d at 34 n.5 (holding that there was no unreasonable delay where "[n]o more than three months passed from [plaintiff]'s first request to her resignation and much of that time was spent waiting for [plaintiff] to provide more information about her condition.").

*Ergonomic office equipment.* Ms. Pelton alleges that, during her first week at the USPS in November 2013, she made a "reasonable accommodation request for an ergonomic chair, keyboard, mouse, and desk . . . to a staff member who was orienting her." ECF No. 35-1 ¶ 35. According to Ms. Pelton, the employee orienting her refused the request, stating "there was no room in the budget for such an accommodation." ECF No. 35 at 11; ECF No. 35-35 at 4-5 (Pl. Ex. 33 at 21:9-21:19). The USPS disputes this, stating that Ms. Pelton did not request a reasonable

accommodation when she joined the agency in November 2013. ECF No. 35-1 ¶ 35; ECF No. 30-21 (Def. Ex. R). This is a genuine dispute of fact, *see* ECF No. 45 at 4; the question is whether that dispute is material. *See Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012).

The parties agree that Ms. Pelton requested and received an ergonomic keyboard and mouse from her supervisor in 2014, "several months after" her alleged November 2013 request. ECF No. 35 at 11; ECF No. 35-1 ¶¶ 36-37. Any dispute about whether Ms. Pelton requested reasonable accommodations in November 2013 is therefore immaterial as to the ergonomic keyboard and mouse, because a delay of "several months" is not unreasonable. *See Ward*, 762 F.3d at 34 n.5. Because there is no genuine dispute of material fact as to whether the USPS granted Ms. Pelton a reasonable accommodation of an ergonomic keyboard and mouse, the court grants summary judgment in favor of the agency on that issue.

However, whether Ms. Pelton requested an ergonomic chair and desk in November 2013 is material. Ms. Pelton alleges that her "request[s] for an ergonomic chair and desk went unfulfilled for four years"—from November 2013 "until June 2017 and August 2017, respectively." ECF No. 35 at 11. Such a delay would be unreasonable. *See Faison*, 896 F. Supp. 2d at 62 (finding that a three-year delay was unreasonable); *Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (suggesting that a three-year delay would be unreasonable). The USPS argues that Ms. Pelton did not request these accommodations in November 2013. ECF No. 35-1 ¶ 35. Rather, "beginning in March 2017, immediately after [Ms. Pelton] notified [her supervisor] of her medical typing restrictions, the Agency initiated the interactive process, culminating in the Agency granting [Ms. Pelton] several accommodations," including an ergonomic chair and desk. ECF No. 30-1 at 9; ECF No. 35-1 ¶¶ 43-49. Therefore, according to the USPS's account, there was no unreasonable delay.

10

Viewed in the light most favorable to Ms. Pelton, a reasonable jury could find that she requested an ergonomic chair and desk in 2013, that her request went unfulfilled for four years, and that such delay was unreasonable.  The court therefore declines to grant summary judgment on the issue of whether the USPS granted Ms. Pelton a reasonable accommodation of an ergonomic chair and desk.  *See Hampton*, 685 F.3d at 1099.

*Reduced typing time.*  Ms. Pelton alleges that she verbally requested—and received—additional typing time as a reasonable accommodation from her then-supervisor, Mr. Foucheaux, in February 2017.  The USPS seems to dispute this.  *See* ECF No. 45 at 5 n.1.  However, the parties agree that, on March 29, 2017, Ms. Pelton informed her supervisors that her doctor had instructed her to restrict her typing due to her medical condition, and that her then-supervisor, Mr. Cooper, referred her to the RAC.  *See id.*; ECF No. 35-1 ¶¶ 39-40.  The parties do not dispute that, between March 31 and May 15, the RAC gathered various information from Ms. Pelton about her disability and her work environment.  *Id.* ¶¶ 41-46.  The parties also agree that, on May 5, 2017, Mr. Cooper sent Ms. Pelton an email explicitly enforcing her medical typing restrictions.  *Id.* ¶ 27.  In that email, Mr. Cooper stated:

> Please follow your doctor's instructions while we work through the accommodations and attempt to find you assignments and working methods that will accommodate your limitations.[] I know that it is frustrating to have limitations, but it is important to protect your health, and you have my support and cooperation in doing so.

ECF No. 35-11 at 1 (Pl. Ex. 9).

Because it is undisputed both that the USPS granted Ms. Pelton reduced typing time as a reasonable accommodation within at most three months of her request, and that it was actively engaged in the interactive process during much of that time, there is no evidence of unreasonable delay or bad faith.  *See Ward*, 762 F.3d at 34 n.5.  The court therefore grants the USPS summary

judgment on the issue of whether the agency provided Ms. Pelton a reasonable accommodation of reduced typing time.

*Voice-dictation software*.  It is undisputed that, on March 29, 2017, Mr. Cooper suggested that Ms. Pelton might benefit from using a particular voice-dictation software—Dragon Dictate Software—and that the USPS installed that software on Ms. Pelton's computer in June 2017.  *See* ECF No. 35 at 12; ECF No. 45 at 7.  As discussed above, the parties agree that the USPS was engaged in the interactive process from March to May 2017.  Because it is undisputed both that the USPS granted Ms. Pelton voice-dictation software as a reasonable accommodation within at most three months of her request, and that it was actively engaged in the interactive process during much of that time, there is no evidence of unreasonable delay or bad faith during that period.  *See Ward*, 762 F.3d at 34 n.5.

According to Ms. Pelton, the software installed in June 2017 was outdated and incompatible with her computer.  ECF No. 35 at 12.  However, Ms. Pelton did not inform the USPS of this problem until February 2018.  ECF No. 35-1 ¶ 66.  She states that agency personnel installed the correct version of the software on February 14, 2018.  *Id.*  The parties also agree that the agency again installed updated dictation software, Dragon Legal, in March 2018.  *See* ECF No. 35 at 12; ECF No. 45 at 7.  A reasonable jury confronted with this timeline could not find evidence of undue delay, let alone bad faith.  Because Ms. Pelton did not put the agency on notice that the software was ineffective until February 2018, there was no "delay" between June 2017 and February 2018.  *See Pappas v. District of Columbia*, 513 F. Supp. 3d 64, 87 (D.D.C. 2021) (explaining that the employer's obligation to participate in the interactive process is only triggered by an affirmative request for reasonable accommodation).  And once Ms. Pelton alerted the USPS to the problems with the dictation software, the agency took at most two weeks to resolve the issue.

The court therefore grants summary judgment to the USPS on the issue of whether it granted Ms. Pelton voice-dictation software as a reasonable accommodation.

## 2.    Notice

The USPS argues that Ms. Pelton's requests for a modified telework agreement and office with a window were not requests for reasonable accommodation, but rather requests for the agency to honor "personal preferences" unrelated to Ms. Pelton's disability.   ECF No. 45 at 8-9.   If Ms. Pelton did not put the USPS on notice that these requests were linked to her disability, it cannot be held liable for failing to accommodate her.  *See, e.g.*, *Thompson v. Rice*, 422 F. Supp. 2d 158, 176-78 (D.D.C. 2006), *aff'd*, 305 F. App'x 665 (D.C. Cir. 2008) (finding that "a vague request for 'support'" was insufficient to constitute a request for reasonable accommodation).

As a threshold matter, the court must determine whether it can properly consider Ms. Pelton's telework and window-office claims, which were not raised in her complaint.  *See* ECF No. 16 ¶¶ 62-70.   In her complaint, Ms. Pelton raises telework only in the context of her hostile work environment claim, *see id.* ¶ 92(d), and she does not mention the office with a window as an issue at all, *see generally* ECF No. 16.   It is only in her opposition that Ms. Pelton clearly raises the telework agreement and window office as giving rise to failure-to-accommodate claims. *See* ECF No. 35 at 9.   The USPS engages with the issue on the merits in its reply.  *See* ECF No. 45 at 8.

"It is axiomatic that the Plaintiff cannot amend her Complaint by the briefs in support of or in opposition to a motion for summary judgment."  *Harrison v. Off. of the Architect of the Capitol*, 964 F. Supp. 2d 81, 95 n.4 (D.D.C. 2013), *aff'd* No. 14-5287, 2015 WL 5209639 (D.C. Cir. July 16, 2015).   However, Federal Rule of Civil Procedure 15(b)(2) provides that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."  Many courts have found that where a claim is

not properly raised in the complaint but is later raised during summary judgment briefing and the issue is fully briefed without any objection from the defendant, the parties have implicitly consented to "try" the issue within the meaning of Rule 15(b).  *See NAACP Legal Def. & Educ. Fund, Inc. v. Wilkinson*, No. 20-CV-1132, 2021 WL 723993, at *12 n.8 (D.D.C. Feb. 24, 2021) (collecting cases); *Turner v. Shinseki*, 824 F. Supp. 2d 99, 122 n.23 (D.D.C. 2011) (same).  In this Circuit, "[i]t is an open question whether the Federal Rules permit parties to impliedly consent to 'try' issues not raised in their pleadings through summary judgment motions."  *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 596 (D.C. Cir. 2001) (declining to resolve the issue).

Because "most Circuits and at least two judges in this District have agreed that Rule 15(b)(2) applies when a case is adjudicated through summary judgment motions," this court adopts the majority approach.  *NAACP Legal Def. & Educ. Fund, Inc*, 2021 WL 723993, at *12; *cf. Taylor v. Mills*, 892 F. Supp. 2d 124, 138 (D.D.C. 2012) (arguing that Rule 15(b)(2) is inapplicable in such a scenario because, "[w]hen a party responds to an attempt to constructively amend a complaint at the summary judgment stage . . . that response is essentially made under protest and does not rise to [the] level of 'implied[ly] consent[ing]' to the . . . claim being tried.").  The defendant here is a federal agency—an institutional litigant well aware of the "axiomatic" rule that plaintiffs may not amend their complaints via opposition.  *Harrison*, 964 F. Supp. 2d at 95 n.4.  In its reply, the USPS had the opportunity to challenge Ms. Pelton's telework and window-office claims on that ground.  *See, e.g., Hilton v. Wright*, 928 F. Supp. 2d 530, 549 (N.D.N.Y. 2013) (noting defendants' argument that they would be unduly prejudiced by their inability to conduct discovery on a claim raised for the first time during summary judgment briefing).  It chose instead to respond to her claims on the merits.  The court therefore finds that the USPS consented

by implication to "try" Ms. Pelton's telework and window-office claims, pursuant to Rule 15(b)(2), and turns to the merits.

> *Modified telework agreement.*   "An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation," *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999), and "[t]he burden lies with the disabled employee to make such a request," *Badwal v. Bd. of Trustees of Univ. of D.C.*, 139 F. Supp. 3d 295, 313 (D.D.C. 2015).   That request must make clear that the employee "wants assistance with his or her disability."  *Badwal*, 139 F. Supp. 3d at 313.   A request to accommodate a personal preference, divorced from disability, is insufficient.  *See, e.g.*, *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 144 (D.D.C. 2004) ("Because plaintiff has not demonstrated that working from home is a reasonable accommodation responsive to her [disabilities], the Court finds that she is unlikely to prevail on the merits of her disability discrimination claim.").

It is undisputed that, in the fall of 2017, Ms. Pelton's supervisor, Mr. Cheema, modified her telework schedule from three days to two days per week.  ECF No. 35-1 ¶ 30.  Mr. Cheema averred that, in opposing the new telework agreement, Ms. Pelton "told [him] that she needed to be home to take care of service appointments at her home and other such responsibilities," not as a reasonable accommodation for her disability.  ECF No. 30-5 at 44 (Def. Ex. B. at 43); *see* ECF No. 45 at 9.   When asked whether he had considered Ms. Pelton's "medical condition or impairment as a factor" in his decision to reduce her telework schedule, Mr. Cheema answered "no." ECF No. 30-5 at 45 (Def. Ex. B at 44).  During his deposition, Mr. Cheema was asked: "was it your understanding that Ms. Pelton was teleworking because it related to any medical appointments that she needed to attend?"  ECF No. 30-8 at 81 (Def. Ex. E at 80:17-80:20).  He testified: "No, that's not what she told me."  *Id.* at 80:21.  Ms. Pelton offers no evidence to rebut

these statements.  *See generally* ECF No. 35.  Mr. Cheema's statements are therefore undisputed for purposes of summary judgment.  *See Wash. Lawyers' Comm. for C.R. & Urb. Affs. v. U.S. Dep't of Just.*, No. 23-CV-1328, 2024 WL 1050498, at *10 (D.D.C. Mar. 10, 2024) ("Generally, summary judgment may be granted to the moving party upon establishing facts entitling it to judgment on a claim, if the nonmoving party fails to rebut that evidence." (citing *Winston & Strawn v. McClean*, 843 F.3d 503, 507 (D.C. Cir. 2016))).  It is also undisputed that when Ms. Pelton later requested a modified telework agreement as a reasonable accommodation in 2018, it was granted.[1] ECF No. 44-1 ¶ 61.  Based on the undisputed record evidence, which shows that Ms. Pelton told Mr. Cheema that a modified telework agreement was a personal preference rather than a disability accommodation, the USPS did not violate the Rehabilitation Act by denying her request.

---

[1] Ms. Pelton does not argue that the USPS unduly delayed in providing her a reasonable accommodation during the period between when Mr. Cheema revoked her modified telework agreement in late 2017 and when it was reinstated in 2018, *see* ECF No. 35 at 12-13, so the court need not consider that argument.

Ms. Pelton contends that Mr. Cheema's modification of her telework agreement amounts to a revocation of a reasonable accommodation that she had received under Mr. Foucheaux.[2]  *See* ECF No. 35 at 12.  It is true that when an employer revokes a reasonable accommodation, "the question becomes . . . whether it was reasonable for [the employer] to withdraw that existing accommodation." *Isbell v. John Crane, Inc.*, 30 F. Supp. 3d 725, 734 (N.D. Ill. 2014).  But whether the court understands Mr. Cheema's decision as a revocation of a prior accommodation or a denial of a new request for accommodation, "there must be a logical bridge connecting the employee's disability to the workplace changes [s]he requests." *Kelly v. Town of Abingdon*, 90 F.4th 158, 168 (4th Cir. 2024).  Ms. Pelton disclaimed any such connection when she told Mr. Cheema that the purpose of her extended telework was to "take care of service appointments at her home and other such responsibilities," rather than to accommodate her disability.  ECF No. 30-5 at 44 (Def. Ex. B. at 43).  On such a record, the court cannot conclude that the USPS violated the Rehabilitation Act by denying Ms. Pelton's request.

---

[2]  The parties seem to agree in their statements of undisputed material facts that Mr. Foucheaux allowed Ms. Pelton to telework three days a week as a reasonable accommodation. *See* ECF No. 35 at 12; ECF No. 35-34 at 6 (Pl. Ex. 32 at 66:5-66:15); ECF No. 44-1 at 39. However, the court notes some discrepancy in the record.  During his deposition, Mr. Cheema was asked: "Did you have an understanding about why Ms. Pelton was teleworking three days a week when you started?"  ECF No. 30-8 at 81 (Def. Ex. E at 80:6-80:8).  He answered: "My understanding is that it was a holdover from the summer of 2016 when the law department authorized employees to telework three days a week.  My understanding was that that policy had been rescinded at some point after that." *Id.* at 80:9-80:13.  When asked, "Was it your understanding that the telework was a reasonable accommodation?" he answered, "No." *Id.* at 80:14-80:16.  But even assuming that there is a genuine dispute of material fact as to (1) whether Ms. Pelton's original telework schedule was a reasonable accommodation, or (2) whether Mr. Cheema knew or should have known that Ms. Pelton's original telework schedule was a reasonable accommodation, that dispute is immaterial.  As explained, the undisputed record evidence establishes that Ms. Pelton expressly disclaimed any connection between her disability and her telework schedule during her conversation with Mr. Cheema.  This dooms her argument that Mr. Cheema failed to grant a reasonable accommodation or unreasonably withdrew an existing reasonable accommodation.

Because Ms. Pelton did not put the USPS on notice in 2017 that she needed a modified telework schedule as a reasonable accommodation, the agency is entitled to summary judgment on this issue.

*Office with a window.*  The USPS argues that Ms. Pelton requested an office with a window as a matter of personal preference, not as a disability accommodation.  ECF No. 45 at 9.  In 2017, Ms. Pelton emailed Mr. Cooper asking whether she could move to an office with a window because "[i]t would be much more cheerful and be less eye strain to have more light," and "[i]t would also be nice to have cellular reception."  ECF No. 35-28 at 2 (Pl. Ex. 26); ECF No. 45 at 9. She was informed that offices were assigned based on seniority.  ECF No. 35-28 at 1-2 (Pl. Ex. 26); ECF No. 35 at 13; ECF No. 45 at 9.  Ms. Pelton ultimately received an office with a window by reason of seniority in February 2020.[3]  ECF No. 35 at 13.

While no "magic words" are required to request a reasonable accommodation, Ms. Pelton's 2017 email to Mr. Cooper is "simply not enough to plausibly convey a desire . . . for accommodations."  *Pappas*, 513 F. Supp. 3d at 91.  Rather, the email conveys that Ms. Pelton merely preferred an office with a window, and Ms. Pelton has proffered no evidence to suggest otherwise.

---

[3] The USPS initially claimed in its motion for summary judgment that Ms. Pelton had received the office as a reasonable accommodation.  ECF No. 30-2 ¶ 50.  Ms. Pelton disputed this version of events, alleging that she had requested the office as a reasonable accommodation in June 2017, that her request was denied and she was informed that offices with windows were assigned based on seniority, and that she ultimately received an office with a window by reason of seniority—not as a reasonable accommodation—in February 2020.  ECF No. 35 at 13.  In its reply, the USPS seems to reverse course, agreeing with Ms. Pelton that she "ultimately received [an office with a window] on the same basis of seniority as her colleagues."  ECF No. 44 at 3.  There is thus no genuine dispute whether Ms. Pelton was granted an office with a window as a reasonable accommodation; both parties agree that she was not.

Because Ms. Pelton put the agency on notice that her request for an office with a window was a matter of personal preference rather than an accommodation for her disability, the USPS is entitled to summary judgment on this issue.

### B.    Discrimination and Retaliation

Ms. Pelton alleges that the USPS discriminated and retaliated against her, in violation of the Rehabilitation Act, in several ways.  Her discrimination and retaliation claims fall into four categories:

*Overwork:*

- From March to May 2017, the USPS "refused to accommodate [Ms.] Pelton's disabilities," resulting in a period of "physically damaging overwork."  ECF No. 16 ¶¶ 67(a), 75(a).

*Removal from assignments/Underwork:*

- From May 2017 to summer 2019, the USPS "refused to assign work to [Ms.] Pelton and restricted her access to duty section and client work meetings."  *Id.* ¶¶ 67(b), 75(b).  This included "reassign[ing] all her then-existing work in October 2017," *id.* ¶ 67(c), "deny[ing] three separate detail assignment requests from three separate managers outside of the USPS Law Department,"  *id.* ¶ 75(b), and "barr[ing] her from section and HQ USPS internal client work meetings from May 2017 through the [time Ms. Pelton filed her complaint],"  *id.*

- The agency "allowed her to attend two weekly HQ USPS internal client work meetings beginning in early 2018 but ordered her to remain silent and not speak unless spoken to."  *Id.* ¶¶ 67(d), 75(b).

*Temporary revocation of FMLA leave:*

- In November 2017, the agency "temporarily revoked [Ms.] Pelton's FMLA leave . . . days before she was scheduled to undergo medical treatment." *Id.* ¶¶ 67(e), 75(c).

*Poor performance evaluations:*

- The agency issued Ms. Pelton "inaccurate and highly negative performance evaluations and ratings" in 2017, 2018, and 2019. *Id.* ¶¶ 67(f), 75(d).

Discrimination and retaliation claims are governed by the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (applying *McDonnell Douglas* framework to disability discrimination claim); *Solomon*, 763 F.3d at 14 (applying *McDonnell Douglas* framework to disability retaliation claim). Under that framework, the plaintiff must first establish a prima facie case of discrimination and/or retaliation. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of disability discrimination, a plaintiff must show "that (i) [she] suffered an adverse employment action (ii) because of [her] disability." *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1373 (D.C. Cir. 2020) (quoting *Adeyemi*, 525 F.3d at 1226). To establish a prima facie case of retaliation based on circumstantial evidence, a plaintiff must show that "(i) '[s]he engaged in statutorily protected activity'; (ii) '[s]he suffered a materially adverse action by h[er] employer'; and (iii) 'a causal link connects the two.'" *Solomon*, 763 F.3d at 14 (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)).

Once the plaintiff establishes a prima facie case of discrimination and/or retaliation, "the burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decision." *Aka*, 156 F.3d at 1288. "When an employer asserts legitimate,

20

nondiscriminatory reasons for an adverse employment action, we ask 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'" *Waggel*, 957 F.3d 1373 (quoting *Adeyemi*, 525 F.3d at 1226); *see Doak v. Johnson*, 798 F.3d 1096, 1107 (D.C. Cir. 2015) (explaining that, in the retaliation context, the plaintiff must "respond with 'sufficient evidence to create a genuine dispute on the ultimate issue of retaliation' by showing either directly that 'a discriminatory reason more likely motivated the employer,' or indirectly that 'the employer's proffered explanation is unworthy of credence.'" (quoting *Solomon*, 763 F.3d at 14)).

Importantly, the D.C. Circuit has held that "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [the protected characteristic]?" *Id.*

To show that her employer's stated reasons were pretextual, a plaintiff may cite "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or [its] poor treatment of other employees in the same protected group . . . or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). In the context of retaliation, "[t]he temporal proximity between an

employee's protected activity and her employer's adverse action is a common and often probative form of evidence of retaliation," *id.*, although temporal proximity without more is insufficient to survive summary judgment, *see Minter v. District of Columbia*, 809 F.3d 66, 71-72 (D.C. Cir. 2015) ("[W]hen an employer comes forward with a legitimate, nonretaliatory reason for an employment action, 'positive evidence beyond mere proximity' is required 'to create a genuine issue of material fact concerning whether the motive for [an adverse employment action] was . . . retaliation.'" (quoting *Solomon*, 763 F.3d at 16)).

Ms. Pelton moves for partial summary judgment, arguing that she has established prima facie cases of disability discrimination and retaliation on her claims of overwork, underwork, temporary denial of FMLA leave, and poor performance evaluations.  ECF No. 34 at 6-11.  The USPS argues that it is entitled to summary judgment because Ms. Pelton's overwork and underwork claims fail at the prima facie stage.  ECF No. 30-1 at 10.  It also argues that even if Ms. Pelton has made out a prima facie case, it had legitimate, non-discriminatory, non-retaliatory reasons for changing Ms. Pelton's work assignments, temporarily denying her FMLA leave claim, and giving her poor performance evaluations.  *Id.* at 11-14.  Ms. Pelton counters that genuine disputes of material fact related to the agency's motivations preclude summary judgment.  ECF No. 35 at 22-25.

Following the mandate of *Brady*, the court first considers whether Ms. Pelton has sufficiently rebutted the USPS's proffered legitimate reasons for its decisions—and, where Ms. Pelton has done so, the court then considers whether she has made out a prima facie case.  520 F.3d at 494.  In other words: the court need only address Ms. Pelton's cross-motion for summary judgment where she has defeated the agency's motion for summary judgment.

A reasonable jury could find that the USPS's asserted non-discriminatory reason for temporarily denying Ms. Pelton FMLA leave was false, but a reasonable jury could not so find as to Ms. Pelton's removal from work assignments and her poor performance evaluations. The court therefore denies summary judgment on the issue of whether the USPS discriminated and retaliated against Ms. Pelton by temporarily denying her FMLA leave, and otherwise grants the agency summary judgment on Ms. Pelton's discrimination and retaliation claims.

### 1.      Overwork

Ms. Pelton alleges that the USPS discriminated and retaliated against her by failing to accommodate her medical typing restrictions between March and May 2017, resulting in overwork and injury. ECF No. 16 ¶¶ 67(a), 75(a). The court has already found no dispute of material fact that the USPS (1) engaged in the interactive process to accommodate Ms. Pelton's typing restrictions between March and May 2017, and (2) provided her a reasonable accommodation without undue delay *See supra* Part IV.A.1. Ms. Pelton must therefore point to some evidence that the USPS could have accommodated her sooner but did not for discriminatory or retaliatory reasons. She has not done so. Rather, the record shows that her supervisor at the time, Mr. Cooper, affirmatively told her to follow her typing restrictions until accommodations could be implemented. *See* ECF No. 35-11 at 1 (Pl. Ex. 9). The USPS is therefore entitled to summary judgment on the question of whether it discriminated and retaliated against Ms. Pelton by failing to accommodate her medical typing restrictions.

### 2.      Removal from work assignments/Underwork

While the USPS alleges that Ms. Pelton's underwork claim fails at the prima facie stage, it also proffers legitimate, non-discriminatory, non-retaliatory reasons for reducing Ms. Pelton's work assignments. *See* ECF No. 30-1 at 11-12. When Mr. Cheema became Ms. Pelton's direct supervisor in September 2017, he removed her from and reassigned some of her work. ECF

No. 35-1 ¶¶ 28-29.   The USPS argues that Mr. Cheema did so not to discriminate or retaliate against Ms. Pelton, but for legitimate business reasons: "to focus on the work of [the] Pricing and Product Support group," "to account for [Ms. Pelton's] medical typing restrictions," and "to account for [Ms. Pelton's] performance deficiencies, namely issues with providing written and oral legal advice, when assign[ing] [Ms. Pelton] work."  ECF No. 30 at 11.  The agency also points out that "as [Ms. Pelton's] performance improved, Mr. Cheema has assigned [Ms. Pelton] work at her request."  *Id.*

Ms. Pelton has not "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason."  *Brady*, 520 F.3d at 494. She states generally that the agency "ultimately fails to provide a legitimate business reason for its adverse actions," and that "there are multiple genuine disputes of material fact" that preclude summary judgment.  ECF No. 35 at 22-23.  However, the disputed facts she identifies relate only to her FMLA and reasonable accommodation claims, not to her work assignment claims.  *See id.* at 23-25.  Ms. Pelton also points to two instances of temporal proximity between protected activity and her removal from assignments.[4]  ECF No. 46 at 3-4.  Although temporal proximity can be relevant to a retaliation claim, "when an employer comes forward with a legitimate, nonretaliatory reason for an employment action, 'positive evidence beyond mere proximity' is required 'to create a genuine issue of material fact concerning whether the motive for [an adverse employment action]

---

[4] First, "[Ms.] Pelton informed [Mr.] Cooper that she was exceeding her reasonable accommodations due to the work volume and deadlines.  Two days later . . . [Mr.] Cooper removed [Ms.] Pelton from the international law group and removed other regular duties."  ECF No. 46 at 3.  Second, "[s]ometime in September 2017, [Mr.] Cooper and [Mr.] Calamoneri shared with [Mr.] Cheema their assessments of [Ms.] Pelton's disability and reasonable accommodations, which were sufficiently negative to motivate [Mr.] Cheema to withdraw even more work from [Ms.] Pelton by September 26, 2017."  *Id.* at 3-4.

was . . . retaliation'"—and Ms. Pelton has offered no such evidence.  *Minter*, 809 F.3d at 71-72

(quoting *Solomon*, 763 F.3d at 16).

Because Ms. Pelton did not produce sufficient evidence for a reasonable jury to find that

the USPS's asserted reasons for reducing her work assignments were pretextual, the agency is

entitled to summary judgment on this issue.  In light of this determination, the court need not

consider whether Ms. Pelton has established prima facie cases of discrimination and retaliation

concerning her work assignments, and her cross-motion for summary judgment is denied as to that

issue.

### 3.      Temporary revocation of FMLA leave

The USPS assumes that Ms. Pelton has established a prima facie case but argues that it had

a legitimate, non-discriminatory, non-retaliatory reason for temporarily denying her FMLA claim.

ECF No. 30-1 at 12-13.  Ms. Pelton claims that the reason was pretextual.  ECF No. 35 at 15-16.

The court concludes that a reasonable jury could find that the USPS's asserted reason was false,

such that the USPS is not entitled to summary judgment on this claim.

The following facts are undisputed.  Ms. Pelton submitted a request to be certified for

FMLA leave related to her disability on March 31, 2017.  ECF No. 35-1 ¶ 51.  On May 16, 2017,

the  USPS  approved  Ms. Pelton  for  FMLA  leave  "for  unscheduled  absences  with  a

frequency/duration of 1 time every 2-3 months for 3-5 days per episode."  *Id.* ¶ 55.   On

November 8,  2017,  Ms. Pelton  requested  advance  (or,  scheduled)  FMLA  leave  for

November 16-18, 2017 and December 14-16, 2017.  *Id.* ¶ 56.  That same day, the agency requested

that Ms. Pelton recertify her approved FMLA leave.  *Id.* ¶ 57.

The parties disagree, however, about why the USPS requested that Ms. Pelton recertify her

leave.   Ms. Pelton alleges that the agency's recertification request was discriminatory and

retaliatory.  ECF No. 16 ¶¶ 67(e), 75(c).  The USPS offers a non-discriminatory, non-retaliatory

25

reason: that Ms. Pelton's initial certification did not support her requested FMLA leave.  ECF No. 35-1 ¶ 58.  Specifically, "[t]he Agency had approved Plaintiff in May 2017 for unscheduled FMLA leave, but her November 2017 request was for scheduled FMLA leave, which was not covered by the May 2017 approval."  ECF No. 45 at 12; ECF No. 35-1 ¶¶ 55-56.

Ms. Pelton argues that this reason was pretextual, pointing out that the USPS's proffered reason for requiring she recertify her FMLA leave differs from her supervisor, Mr. Cheema's, explanation.  *See* ECF No. 35 at 25; *see generally* ECF No. 45.  In his deposition, Mr. Cheema testified that he had asked Ms. Pelton to recertify her FMLA leave because she had not included a case number on her leave slip as required.  ECF No. 35 at 25; *see* ECF No. 35-33 at 21 (Pl. Ex. 31 at 93:1-94:12).  In an earlier affidavit, Mr. Cheema offered a different reason that aligns with the USPS's current rationale.  He averred that Ms. Pelton "was asked to recertify her leave because she was not using leave consistently with her approved FMLA request," and that "federal law allows employers to recertify cases where circumstances described by an earlier certification have changed."  ECF No. 30-5 at 31-32 (Def. Ex. B at 30-31).

"A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's . . . inconsistent or dishonest explanations."  *Walker*, 798 F.3d at 1092.  "[S]hifting and inconsistent justifications are 'probative of pretext,'" *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (quoting *Sears Roebuck & Co.*, 243 F.3d at 853), but "fine descriptive differences between materially consistent accounts, without more, do not tend to . . . support an inference of discrimination or retaliation."  *Walker*, 798 F.3d at 1094.  In *Walker*, for example, the court held that "minor variations" in a supervisor's description of the plaintiff's behavior—that "[plaintiff] 'drop[ped]' or 'tossed (with emphasis)' or 'swiftly placed' or 'slammed' the leave slip on the

desk"—were insufficient to support an inference of discrimination or retaliation because "every account describe[d] [plaintiff] as terse and abrupt."  *Id.*; *see Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 399 (D.C. Cir. 2020) (holding that defendants' justifications were "neither inconsistent nor shifting" where "all three of [defendants'] explanations sing the same tune: that [the plaintiff's] skills and expertise in electrical engineering did not align with the skills sought for" either job opening).

Here, the USPS's explanation and the rationale Mr. Cheema offered in his affidavit are not materially consistent with the reason Mr. Cheema provided in his deposition.  While there could well be an innocent explanation for this inconsistency, a reasonable jury could find that the USPS's and Mr. Cheema's explanations are materially inconsistent (or that the explanations provided in Mr. Cheema's deposition and affidavit are materially inconsistent) and that one or both of these proffered explanations is pretextual.  The court therefore denies summary judgment as to whether the USPS discriminated and retaliated against Ms. Pelton by requiring her to recertify her FMLA leave.[5]

Because the court denies the USPS's motion for summary judgment on the FMLA claim, it must consider whether Ms. Pelton is entitled to partial summary judgment on the basis that she has established a prima facie case that the agency's temporary denial of her FMLA leave was discriminatory and retaliatory.  ECF No. 34 at 8, 10.  As noted, the agency does not dispute that

---

[5] In discussing her hostile work environment claims, Ms. Pelton also argues that the temporal proximity between a protected activity (her March 31, 2017 request to be certified for FMLA leave) and the adverse action (the USPS's requirement that she recertify her leave in November 2017) is further evidence of pretext.  *See* ECF No. 35 at 18-19.  Because the USPS's inconsistent explanations are sufficient evidence of pretext, the court need not consider whether a six-month gap between protected activity and adverse action suggests retaliation.  *See* ECF No. 46 at 2 ("Courts in this district often use a three-month rule to establish causation on the basis of temporal proximity.").

Ms. Pelton has established a prima facie case, *see* ECF No. 30-1 at 12; ECF No. 44; ECF No. 45, but a court reviewing an unopposed motion for summary judgment must still "determine for itself whether the record and any undisputed material facts justify granting summary judgment." *Winston & Strawn, LLP*, 843 F.3d at 507 (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 95 (D.C. Cir. 2015)).

The court denies Ms. Pelton's motion for summary judgment on this issue because it is unclear whether there is a causal link between the alleged adverse action and Ms. Pelton's disability. To establish a prima facie case of disability discrimination, a plaintiff must show "that (i) [she] suffered an adverse employment action (ii) because of [her] disability." *Waggel*, 957 F.3d at 1373 (quoting *Adeyemi*, 525 F.3d at 1226). To establish a prima facie case of retaliation based on circumstantial evidence, a plaintiff must show that "(i) '[s]he engaged in statutorily protected activity'; (ii) '[s]he suffered a materially adverse action by h[er] employer'; and (iii) 'a causal link connects the two.'" *Solomon*, 763 F.3d at 14 (quoting *Jones*, 557 F.3d at 677). Even assuming that a requirement to recertify FMLA leave is an adverse employment action sufficient to support cognizable discrimination and retaliation claims, it is unclear whether the USPS required Ms. Pelton to recertify because of her disability, as discussed above. In fact, Ms. Pelton herself states that "[t]here are genuine disputes of material fact regarding why Defendant recertified [Ms.] Pelton's FMLA leave." ECF No. 35 at 25. The court therefore denies Ms. Pelton's motion for summary judgment on this issue.

### 4.      Poor performance evaluations

The USPS assumes for the purposes of its motion that Ms. Pelton has established a prima facie case but argues that it had a legitimate, non-discriminatory, non-retaliatory reason for giving her poor performance evaluations. ECF No. 30-1 at 13-14.

The parties agree that Ms. Pelton received ratings of 1 or 2 on her 2017, 2018, and 2019 performance evaluations.  ECF No. 35-1 ¶¶ 20-22.  A "1" is the lowest possible score on the evaluation.  ECF No. 16 ¶ 56.  Ms. Pelton alleges that these performance evaluations were "inaccurate and highly negative," and that each negative evaluation was an instance of discrimination and retaliation.  *Id.* ¶¶ 67(f), 75(d),

The USPS argues that it had legitimate, non-discriminatory and non-retaliatory reasons for these poor performance evaluations—namely, "that [Ms. Pelton's] supervisors had issues with her performance" that were unrelated to her disability.  ECF No. 30-1 at 13; ECF No. 35-1 ¶¶ 11-17.  According to the agency, "both supervisors' assessment of [Ms. Pelton's] performance, namely her inability to provide concise and pointed oral and written advice, was that she ranked near the bottom of attorneys in the Pricing and Product Support Group."  ECF No. 30 at 13; ECF No. 35-1 ¶¶ 11-17.  For example, Ms. Pelton "struggled to provide concise written and oral counsel to Agency clients," her "written work often required correction," and she "did not conduct herself appropriately in meetings with clients, providing non-relevant legal counsel."   ECF No. 35-1 ¶¶ 11-12, 14.

Ms. Pelton's main argument seems to be that the USPS's stated explanation must be pretextual because it is inaccurate.  *See* ECF No. 35 at 17.  She alleges that "her communications were concise," that she "had a good relationship with clients," and that she "has received few or no client complaints about her communication."  ECF No. 35-1 ¶ 11.  Ms. Pelton also states that she "has received a number of positive comments from clients over the years, including expressing their satisfaction with her contributions."  *Id.*

A plaintiff can show that an adverse employment action was made for a discriminatory or retaliatory reason by "show[ing] that the nondiscriminatory explanation the defendant proffered

for its decision was false." *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (quoting *Czekalski v. Peters*, 475 F.3d 360, 366 (D.C. Cir. 2007)).  But, "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.  In other words, "[a]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." *Id.* (quoting *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005)).

Here, Ms. Pelton has not raised sufficient evidence for a jury to conclude that her supervisors did not reasonably believe what they wrote in her performance evaluations. Ms. Pelton's argument relies heavily on positive statements that Mr. Cooper and Mr. Cheema made about her work.  For example, Mr. Cheema stated in his deposition that, "for the most part," he believes Ms. Pelton has good relationships with her clients.  *See* ECF No. 35-1 ¶ 11; ECF No. 35-33 at 14 (Pl. Ex. 31 at 72:7-72:9).  When asked during his deposition whether Ms. Pelton's clients had ever complained about her writing or her ability to give clear and concise advice, Mr. Cooper replied: "I can't recall at the moment other than the context of [] one conversation . . . where [a client] felt [Ms. Pelton's] commentary was off point and not pertinent." *See* ECF No. 35-1 ¶ 11; ECF No. 35-34 at 4-5 (Pl. Ex. 32 at 64:20-65:4).  But these comments are not inconsistent with Ms. Pelton's 2017-2019 performance evaluations, which included some positive feedback about her performance.  For example, Mr. Cooper stated in Ms. Pelton's 2017 performance evaluation that she was "customer focused . . . and has helped a number of client groups problem-solve when confronted with regulatory constraints."  ECF No. 30-13 at 5-6 (Def. Ex. J at 4-5).  However, he also stated, in both his 2017 mid-year and 2017 end-of-year evaluations, that Ms. Pelton should "focus on making her communications more clear, concise, relevant and

useable." *Id.* at 5. In her 2018 performance evaluation, Mr. Cheema stated that Ms. Pelton "is clearly committed to providing timely advice to our clients" and "has developed good working relationships with some of our clients." ECF No. 30-14 at 4-5 (Def. Ex. K at 3-4). However, Mr. Cheema simultaneously raised serious concerns about Ms. Pelton's performance, stating that her "advice to clients routinely includes non-relevant information [which] makes her advice not practical and usable." *Id.* On one occasion, Ms. Pelton communicated a client's personal information to a judge without the client's permission—a "serious misstep [that] upset the client and required [Mr. Cheema] to intervene to repair the client relationship." *Id.* Ms. Pelton's 2019 performance evaluation was similarly uneven: while Mr. Cheema found that Ms. Pelton "maintain[ed] good relationships with her clients," he reiterated that her communications were "typically over-inclusive and thereby unfocused." ECF No. 30-15 at 4 (Def. Ex. L at 3). Thus, the positive comments that Ms. Pelton points to align with, rather than undermine, the assessments made by her supervisors in her performance evaluations.

Ms. Pelton also points to statements she made in her own deposition to support her argument that she performed her job well. But, in the context of subjective assessments of an employee's performance, courts have held that the plaintiff's "mere personal opinion" of her own strong performance is "insufficient to surmount summary judgment." *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). "[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Id.* (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)). Ms. Pelton's performance evaluations, which include both employee self-evaluations and supervisor evaluations, reveal that Ms. Pelton's opinion of her work and her supervisors' perceptions did not always match. In her 2019 performance evaluation, for example,

31

Mr. Cheema explicitly stated that he "would not share [Ms. Pelton's] characterization of her work as 'highly effective.'"  ECF No. 30-15 at 4 (Def. Ex. L at 3).[6]

Finally, Ms. Pelton argues that the temporal proximity between a protected activity (her November 2017 request for FMLA leave) and the adverse action (her 2017 performance evaluation) is further evidence of pretext.  *See* ECF No. 46 at 6.  But, as discussed above, temporal proximity without more is insufficient to survive summary judgment.  *See Minter*, 809 F.3d at 71-72.

Because Ms. Pelton has not produced sufficient evidence for a reasonable jury to find that the USPS's asserted non-discriminatory, non-retaliatory reasons for issuing her poor performance evaluations were not its actual reasons for doing so, the agency is entitled to summary judgment on this issue.  In light of this determination, the court need not consider whether Ms. Pelton established prima facie cases that her performance evaluations were discriminatory and retaliatory; Ms. Pelton's cross-motion for summary judgment is denied as to that issue.

### C.    Hostile Work Environment

To establish a prima facie hostile work environment claim based on disability, a plaintiff must allege that "(1) she is disabled . . . ; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her disability . . . ; (4) the harassment affected a term, condition,

---

[6] In her opposition, Ms. Pelton also seems to argue that her poor performance evaluations were themselves the result of the USPS's other alleged acts of disability discrimination.  ECF No. 35 at 17.  Ms. Pelton explains that from 2013 to 2017, her former supervisor (Mr. Foucheaux) provided reasonable accommodations and gave her positive performance reviews.  *Id.*  Then, "[a]fter a year of [the USPS] failing to accommodate [Ms. Pelton], [Mr.] Cooper and [Mr.] Cheema issued [Ms.] Pelton's first negative performance evaluation at [the] USPS." *Id.*  In this way, according to Ms. Pelton, "Defendant's disability discrimination caused her poor performance evaluations."  *Id.*  But this is not an argument that the USPS discriminated or retaliated against Ms. Pelton by giving her poor performance reviews.  Rather, it is a claim that Ms. Pelton's poor performance evaluations were a downstream consequence of *other* acts of discrimination and retaliation.  While such an argument may go to Ms. Pelton's damages, it does not support an independent discrimination or retaliation claim.

or privilege of employment; and (5) there is a basis for holding the employer liable for the creation of the hostile work environment." *Floyd v. Lee*, 968 F. Supp. 2d 308, 328 (D.D.C. 2013).  To prevail on her hostile work environment claim, "a plaintiff must show that h[er] employer subjected h[er] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.*  "[A] few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002).

Ms. Pelton alleges that the USPS created a hostile work environment by subjecting her to the adverse actions that form the basis of her failure to accommodate, discrimination, and retaliation claims.  *See* ECF No. 16 ¶¶ 91, 92(a), (b), (d).  However, the court has already found that the USPS did not fail to provide reasonable accommodations of an ergonomic keyboard and mouse, reduced typing time, voice-dictation software, modified telework agreement, and office with a window.  *See supra* Part IV.A.  Further, the agency has pleaded—and Ms. Pelton has not raised sufficient evidence to convince a reasonable jury otherwise—that it removed Ms. Pelton from work assignments and gave her poor performance evaluations for reasons unrelated to her disability.  *See supra* Part IV.B.  Evidence that "bears no connection to [a plaintiff's protected status] cannot support a hostile work environment claim." *Harris v. Wackenhut Servs., Inc.*, 419 F. App'x 1, 2 (D.C. Cir. 2011) (per curiam).  This leaves only a handful of adverse actions that could plausibly support a hostile work environment claim: the USPS's alleged failure to timely

provide an ergonomic chair and desk, and the agency's requirement that Ms. Pelton re-certify her FMLA leave in November 2017.

Ms. Pelton further alleges that the USPS created a hostile work environment because (1) in February 2017, the USPS's Chief Human Resources Officer told Ms. Pelton that she needed to find another position because the agency's General Counsel and Deputy General Counsel thought that she was "not a good fit," ECF No. 16 ¶ 92(c), and (2) Mr. Cooper denied three requests from managers in other departments for Ms. Pelton to go on detail assignments outside of the USPS Law Department, *id.* ¶ 92(e).  The USPS argues that Mr. Cooper denied those detail requests not because of Ms. Pelton's disability, but because he denied all requests for details outside of the law department.  ECF No. 30-1 at 17.  Ms. Pelton disputes whether this is true.  ECF No. 35-1 ¶¶ 59-60, 62.[7]

"The bar for demonstrating a hostile work environment claim is a high one."  *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016).  Considering the totality of the circumstances and construing all disputed facts in the light most favorable to her, Ms. Pelton cannot clear that bar.  The alleged conduct here is less severe than in cases where the D.C. Circuit has declined to find a hostile work environment.  In *Brooks v. Grundmann*, 748 F.3d 1273 (D.C. Cir. 2014), for example, the D.C. Circuit held that the plaintiff failed to demonstrate sufficiently severe and pervasive harassment where her supervisor "yelled[ed] at her in front of co-workers, insult[ed] and demean[ed] her," threw a notebook at her, issued her negative performance reviews, and selectively enforced a time and attendance policy to her detriment.  *Id.* at 1275-76.  And in *Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008), the D.C. Circuit found no hostile work

---

[7] Ms. Pelton also alleges that her supervisors created a hostile work environment by failing to respond to her requests for training, ECF No. 16 ¶ 92(e), but it is undisputed that Ms. Pelton was able to attend the training in question, *see* ECF No. 35-1 ¶ 34.

environment where the plaintiff's supervisor issued him poor performance reviews and a letter of reprimand, restricted plaintiff's ability to take sick leave, proposed that plaintiff be suspended, and "allegedly threatened to have [plaintiff] arrested, led out of the building in handcuffs, and jailed." *Id.* at 1195.  Given such precedent, Ms. Pelton has not plead that any harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Baloch*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21).  The court therefore grants summary judgment to the USPS (and denies partial summary judgment to Ms. Pelton) on Ms. Pelton's hostile work environment claim.

## V.    Conclusion

For the foregoing reasons, Ms. Pelton's Cross-Motion for Partial Summary Judgment, ECF No. 34, is hereby **DENIED**.  The USPS's Motion for Summary Judgment, ECF No. 30, is hereby **DENIED** as to (1) Ms. Pelton's claim that the USPS failed to timely provide her an ergonomic chair and desk as reasonable accommodations and (2) Ms. Pelton's claim that the agency discriminated and retaliated against her by requiring her to recertify her FMLA leave in November 2017.  The USPS's Motion for Summary Judgment is otherwise **GRANTED**.

It is further **ORDERED** that the parties shall file a status report governing future proceedings, including whether they seek a referral to a Magistrate Judge for mediation, on or before May 24, 2024.

**SO ORDERED.**

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date: May 3, 2024